**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL ACTION NO. ___1:23-cv-71____**


| | |
|---|---|
| KING BIO, LLC, DR. FRANK KING, ) <br> and MS. SUZIE KING, each individually, ) <br> ) <br>      Plaintiffs     ) <br> v.    ) <br> ) <br> CONTINENTAL NATIONAL ) <br> AMERICAN GROUP, CNA FINANCIAL ) <br> CORPORATION, CONTINENTAL ) <br> CASUALTY COMPANY, and ) <br> CONTINENTAL ASSURANCE ) <br> COMPANY OF NORTH AMERICA, ) <br> collectively "CNA" ) <br> ) <br>      Defendants.    ) | COMPLAINT <br> TRIAL BY JURY DEMANDED |


## I. PARTIES

1.  The Plaintiff King Bio, Inc. ["KB" hereafter], a North Carolina corporation, is headquartered at 3 Westside Drive, Asheville, NC.

2.  The individual plaintiffs, Dr. Frank King, and his wife, Ms. Suzie King, are residents of Buncombe County, NC.

3.  The Defendants are Continental National American Group, CNA Financial Corporation, Continental Casualty Company, and Continental Assurance Company of North America, their affiliates and subsidiaries, doing business and known as "CNA", and collectively identified hereafter as "CNA". CNA has its headquarters located at 151 N. Franklin St., Chicago, IL.

1

4.     CNA operates its insurance business(es) throughout the United States, and internationally, including conducting substantial business within the State of North Carolina.

5.     CNA represents itself as offering "a broad portfolio of property and casualty business insurance solutions that allow you to better manage your risks and grow profitably."

## II. JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action, and over the parties hereto, pursuant to 28 U.S.C. 1332 (diversity of citizenship), and the amount in dispute being greater than $75,000. Venue is proper in this Court pursuant to 28 U.S.C. 1391.

## III. GENERAL ALLEGATIONS APPLICABLE TO
## ALL CAUSES OF ACTION

7.     At all times relevant to the allegations and claims stated herein, KB was insured by CNA "Business Owners Insurance Policy" 4024167234 ["Policy" hereafter].  CNA represented to KB that, pursuant to that policy, KB would "have insurance coverage tailored to meet the needs of your business", and that "[T]he international network of insurance professionals and the financial strength of CNA, rated 'A' by A.M. Best, provides resources to help you manage the daily risks of your organization so you may focus on what's most important to you."

8.     The administration of the KB claims identified herein have been the subject of CNA claim number E2F54824.

9.     Since 1987, KB has produced nutritional and homeopathic products sold by retailers and wholesalers throughout the U.S., and internationally, and via the internet.

10.     On February 27, 2017, continuing through March 1, 2017, the Asheville city water line servicing KB's facilities, located at 3 Westside Drive, and 150 Westside Drive, in Asheville, NC,

2

ruptured. This caused muddy water to encroach into KB's water filtration systems at both of those KB locations. Those systems are critical to the production of KB's product line of nutritional and homeopathic products.

11.    At that time of, and immediately following, the water line rupture, there was no abnormality of or in the water evident in KB's manufacturing locations, because the KB on-site water filtration systems filtered the muddy water. KB's commercial water purification providers twice analyzed, cleaned and sanitized KB's water systems, and all water lines.

12.    In early 2017, the initial determination by KB, and by its retained experts, was that no detectable contamination had resulted from the initial water main rupture.

13.    In accordance with expert recommendations, during this period KB attempted, on 2 occasions, to clean and sanitize the reverse osmosis ("RO") systems of the mud deposited as the result of the water line rupture. As conceded by CNA's "large loss claim adjuster", Mr. Terry Watkins ["Watkins" hereafter], KB's attempts were unable to get those systems cleaned.

14.    KB also elected during the follow up investigation period to replace the water purification system at its 3 Westside location, including installing all new plumbing, new HEPA filtration systems, air duct work, and ceiling tiles, as recommended by KB's consulting experts.

15.    On August 2017, replacement of the KB water filtration system at 3 Westside Dr., Asheville, was completed.

16.    Follow-up testing then conducted did not detect any problems, and there were therefore no damages to be detected. All KB products produced at that time tested within specifications. The performance of the proper protocols was within the policy deductible, and no insurance claim was therefore made.

3

17.     CNA's choice of the date of February 27, 2017, for the date of loss, when there was no loss incurred that could be determined at that time, was therefore arbitrary, self-serving, and contrary to CNA's obligations to KB under the Policy, and pursuant to governing law.

18.     In August 2017, KB first began to experience remote product failures in its standard product testing at the time of manufacture. This led to continued testing and a continuing investigation to determine the cause of those failures.

19.     In May 2018, a forensic microbiologist was retained on-site to review and analyze the then current filtration process. During this period no product was released by KB that was out of specifications. The forensic microbiologist provided a list of potential areas to address, and these areas were either upgraded or repaired.

20.     In May 2018, KB also replaced the water filtration system and all RO membranes at 3 Westside Dr.

21.     In July 2018, KB added an additional UV filtration process, and started the validation of the water filtration system with the new RO and UV filters at 3 Westside.

22.     In August 2018, while most of the KB products tested fine at manufacturing, when released for sale/distribution some of the product began to later fail. This was the first sign that there might be a larger problem.

23.     The consensus from KB's retained experts reviewing the situation was that there was a possibility that the incursion of the mud from the city water line rupture possibly had built up to a detectable level of contamination that could be identified as a naturally occurring soil-based contaminant. As a result, and in accordance with FDA requirements, KB conducted a voluntary recall of all of its water-based products beginning in August 2018. Water based products represented 98%+ of KB's product line.

4

24.     Also in August 2018, discovery of possible contamination resulting from the water line rupture required the shutdown of KB's production for a period of 12 months, through August 2019, in order to complete an FDA required year-long validation of KB's water system. Approximately 80% of KB's employees were laid off during that time.

25.     Following validation of the water system, after the FDA ordered testing concluded on August 19, 2019, KB was then required by the FDA to perform 3 years of stability testing for all products before it could be permitted to produce, and market, its customary three-year shelf-life on its products. That three-year shelf life was essential for KB to have the commercial ability to market to distributors and retailers.

26.     On April 4, 2020, having now experienced the multiple and unforeseen cascading events from February 2017, along with the ongoing significant damages resulting from those events, and before the damages arising from any of those unanticipated events could be determined, KB notified CNA of its intention to make claims on the CNA policy within its submitted Property Loss Notice. The identified locations of the property loss were KB's two production facilities at 3 Westside Dr., and 150 Westside Dr., Asheville, NC.

27.     Contrary to the express language of the policy, and also contrary to the reasonable understandings and expectations of KB, CNA then began its process of making unilateral, arbitrary, and oppressive determinations throughout the settlement process, as established further hereafter.

28.     Those actions by CNA comprised a clear breach of CNA's contractual obligations to KB, violated N.C.G.S. § 58-63-15 (11) establishing good faith standards for the settlement of the claims of insured parties such as KB by insurers such as CNA, and thereby also comprised a *per se* violation of the North Carolina Unfair and Deceptive Trade Practices Act.

5

29.     After KB's commencement of the claims process, CNA's initial KB coverage determinations did not begin until over a year later, in May of 2021. At that time, while conceding coverage, and ignoring the express provisions of the policy, CNA paid only $6,652.90 to KB for the cleaning (not for the equipment replacement that had occurred 4 years before) of KB equipment, and $30,645.75 for "filters used prior to determining the cause of loss" *at the 3 Westside facility only*.    A net payment was then made by CNA to KB of $32,298.65 after application of the $5,000 deductible.  This payment totally ignored the actual cost of repair, replacement, and rebuild of the equipment in the amount of $179,820.22 *for only the equipment at 3 Westside*.

30.     Continuing CNA's bad faith settlement and deceptive practices CNA  paid nothing to KB for replacement of the KB water filtration system at KB's 150 Westside facility.    The 3 Westside facility is only 24,000 s.f., while the 150 Westside facility consisted of 150,000 s.f.  As a direct result of CNA's failure to provide coverage for replacement of KB's water filtration system at 150 Westside Dr., in order for KB to survive over the  periods  of  required testing, revalidations, *etc.*, the KB 150 Westside facility, comprising 85% of KB's production capacity, had to be sold.

31.     After that**,** on April 8, 2022, CNA proffered  a payment to CNA of only $62,082 for business income losses to KB, limited by CNA to an arbitrary 39-day period between February 20, 2017, and March 31, 2017, a period 5 years before, wholly ignoring the express terms of the CNA/KB policy with regard to lost business income, as well as the "extra expense" portions of the KB policy.

32.     It was then not until over a further year later, on September 20, 2022, that CNA belatedly proffered a further   payment to KB for the actual,  and undisputed,  costs of repair and

6

replacement of the equipment *at 3 Westside only.*  CNA's proposal was prefaced with the statement that "[CNA] maintains its position that it has paid KB all undisputed amounts due under the policy for [KB's] loss."  CNA's proposal also required that KB provide "a full and final release under the policy" as a condition of acceptance of CNA's proposal.

33.    That proferred payment was broken down as follows: $179,820.22 ("as claimed") cost of replacement of equipment at 3 Westside only; $78,819.69 represented as an extension of the business interruption. To the end of June 2017 (a further 4 months and 11 days); $25,000 represented as payment under a "limited  fungus wet rot, dry rot and bacteria coverage (product)"; $32,941.15 "limited  fungus wet rot, dry rot and bacteria coverage (business interruption – September 2017)".  The total proffered amount was $316,581.06.

34.     CNA's actions during the relevant period of time severely deprived KB of critically needed cash flow to restore the KB business, and also significantly increased and exacerbated the ongoing business income losses, and the required extra costs expenditures of KB.

35.    CNA also continued to ignore its obligations to provide policy coverage to KB for the repair, testing, and revalidation process necessary to retore KB's 150 Westside facility to operational capacity.  KB obtained estimates to replace and/or revalidate KB's inhouse clean manufacturing rooms, micro lab and equipment, identity testing equipment, R&D lab, and equipment at 150 Westside, which were all shut down by the FDA until corrective actions could be completed.  The estimated cost to complete this required process was $1.15 million. This amount does not include damages incurred by FDA's stoppage of new products about to be released, new products, R&D in process, or loss of 50% of KB's production capacity at 150 Westside, which was the result of CNA failing to provide the coverages it was obligated to provide to restore the 150 Westside facility.

7

36.     With the exception of the 150 Westside facility not having been repaired as a result of CNA having failed to provide insurance proceeds to repair that facility, it was not until December 2021, that all of the repair, expert diagnosis, compliance, guidance, FDA required revalidations, and required stability testing, were completed, almost wholly at the expense of KB as a result of the refusal of CNA to provide the required insurance coverages..

37.     Additionally, the FDA required recall of all KB products did not end until January 19, 2022. This was therefore the first time that KB could make an objective assessment of the damages suffered to KB's business income, extended business income, extra expense, and restoration expense damages incurred by KB.

38.     There was therefore never any reasonable foreseeability of the ongoing series of multiple cascading events, emanating from the water main break. Those continuing events were the cause of multiple and substantially varied types of cascading losses resulting from the invasion of mud into the KB system. These ongoing and separate events were the cause of the initial testing by KB, repair and replacement of KB's water filtration system at 3 Westside, ongoing testing, and expert analysis of product by KB related to water quality issues, further testing, limitations placed by the FDA on KB production, product validation's and revalidations, product recalls, *etc*.

**THE CNA POLICY COVERAGES:**

39.     Under the express language of the CNA policy Declarations, and Endorsements, KB was insured for costs related to the necessary replacement of its equipment, "business income" losses for a period of 12 months, extended business income losses, extra expenses, and restoration expense incurred by KB to address the ongoing and developing multiple conditions created by

8

the water main break. *See*, SB-146801 Sec. 20(b)(1); SB300845C Sec. 8(A)(b)(2). Also, and as established after this, because the policy Declarations control, there is no limitation of the "12 months" periods of "business income loss", or "extra expense" to 12 "consecutive months" pursuant to the provisions of Endorsement SB146802E, part 4.a.

40. CNA's wrongful acions also resulted in the termination of any right of CNA to enforce any coverage limitation provisions of the CNA policy. CNA is therefore liable for any damages proximately caused by its breach of contract, its failure to comply with the standards of good faith settlement practices, and its deceptive and unfair insurance settlement practices.

**POLICY COVERAGE FOR PROPERTY DAMAGE:**

41. Correspondence then occurred over the period of May and September, 2022, between KB and CNA's "property large loss claim" representative Terry Watkins. In early May, 2022, KB counsel invited CNA to discuss resolution of the KB claim(s). The CNA response was vague and non-committal. KB then prepared a detailed and specific demand to CNA on June 27, 2022, with regard to the KB claim(s).

**POLICY COVERAGE FOR BUSINESS INCOME LOSS:**

42. Pursuant to the package policy declarations, CNA was required to pay to KB policy proceeds for lost business income for "12 months actual loss sustained". The Declarations do not identify a dollar limitation for that coverage, nor for the "extra expense coverage". The provisions of endorsement SB146802E define "business income" in 1.a., and 1.a.2, as "net income that would have been earned ...", by KB, "including normal operating expenses incurred, including payroll subject to a 90 day limitation...".

43. Also pursuant to Endorsement SB146802E, part 4.a., *if* the Declarations show, for Business Income, and Extra Expense, that coverage would be for actual loss sustained for "12 consecutive months", then CNA would pay the actual Business Income, and Extra Expense losses, for 12 consecutive months following the date of direct physical loss or damage or actual loss sustained for the number of months shown on the Declarations page. However, the Declarations **do not state** "12 consecutive months". Rather, they represent that lost Business Income, and Extra Expense will be provided for **"12 months actual loss sustained".** The "12 months actual loss sustained" coverage for actual Business Income loss, and for Extra Expense, is therefore the relevant period per the express language of the CNA policy pursuant to its express Declarations to KB. CNA failed to provide the required coverage, and has failed to provide any valid reason for that failure.

44. Also pursuant to Endorsement SB146828E, part 2.c [equipment breakdown], CNA was to pay policy proceeds to KB for any Business Income loss "caused by or resulting from a 'breakdown" to equipment that is owned, operated, or controlled by a local public or private utility …" that provides water supply to KB. By the express language of the policy such KB was also entitled to receive such coverage.

45. Continuing its bad faith/loss minimization dealings regarding the KB claim, on April 8, 2022, CNA provided a payment of only $62,082 for business income losses to KB, limited to an arbitrary, and baseless, 39-day period between February 20, 2017, and March 31, 2017. That time period was for 5 years before, wholly ignoring the terms of the CNA/KB policy with regard to lost business income. This was in conjunction with CNA's continued ignoring of KB's substantial losses with regard to KB's 150 Westside facility, which remained inoperable.

10

**POLICY COVERAGE FOR EXTENDED BUSINESS INCOME LOSSES:**

46.     Pursuant to the package policy Declarations, CNA was required to pay to KB policy proceeds for Extended Business Income losses.  *See*, Endorsement SB146802E, part 3.  It is undisputed that the KB operations were suspended, resulting in an actual loss of business income, as defined in part 1 of the Endorsement.

47.     Pursuant to Endorsement parts 3.a and b, the period of suspension over which coverage is to be applied begins on the date the KB water filtration system  "was actually repaired, rebuilt or replaced and operations are resumed",  and ends "on the earlier of" the date KB could restore its operations with reasonable speed to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage occurred… or 60 consecutive days after the date determined in part a. above", which period was later  increased by Endorsement to 90 additional days.

48.     KB has never been able to resume operations to the level that would have existed if no direct physical damage had occurred.

49.     CNA was therefore obligated to cover KB's lost income for a period of 150 consecutive days after KB's water filtration was replaced and KB's [partial] operations were resumed.  Mr. Watkins/CNA appear to have again totally, and intentionally, ignored this coverage obligation, causing further extensive damage to KB.

**POLICY COVERAGE FOR EXTRA EXPENSES:**

50.     Pursuant to the package policy declarations, CNA was also required to pay to KB policy proceeds for "extra expenses" incurred for a period of "12 months actual loss sustained". Pursuant to Endorsement SB146802E, part 4.a., *if* the Declarations show, for Business Income,

11

and Extra Expense, that coverage would be for actual loss sustained for "12 consecutive months", then CNA would pay the actual Business Income, and Extra Expense losses, for 12 consecutive months following the date of direct physical loss or damage or actual loss sustained for the number of months shown on the Declarations page. However, the Declarations do not state "12 consecutive months". Rather, they represent that lost Business Income, and Extra Expense will be provided for "12 months actual loss sustained". The "12 months actual loss sustained" coverage for actual Business Income loss, and for Extra Expense, is therefore the relevant period per the express language of the CNA policy pursuant to its express Declarations to KB. CNA failed to provide the required coverage, and has failed to provide any valid reason for that failure.

51.     The Declarations do not identify a dollar limitation for the "extra expense coverage". Endorsement SB146802E, subpart 2, defines "extra expense" as "reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a covered cause of loss." The events, and KB losses, clearly comprise a "covered cause of loss."

52.     Undisputed evidence (and common sense) establish that KB incurred significant "extra expenses" in its extended efforts to address the ongoing and cascading events that were causing KB substantial damages over the course of several years, which continue to date.

53.     The accounting **to date** establishes that these total extra costs are in excess of $4,642,651.24, including preliminarily calculated: replacement/revalidation of the water system at 150 Westside, $340,228; revalidate water systems/FDA consultant, $408,210; product recall administrative costs over $170,000; $1,963,897.95 water testing costs; costs related directly to production for and replacement of recalled product; $122,500 legal and accounting costs.

12

54. KB recognized that, in calculating the covered category of "lost business income", and the category of "extra expense", there is likely a degree of duplication to the extent "extra expense" is included in the calculation of "lost business income". However, there is no requirement in the CNA policy that the same time periods are to be used for the "lost business income" calculation, and for the "extra expense" calculation.

## POLICY COVERAGE FOR ORDINANCE OR LAW-INCREASED PERIOD OF RESTORATION [Endorsement SB 146832-B]:

55. This coverage is added to KB's "special property coverage". As defined under this endorsement, a covered cause of loss occurred to KB property.

56. As established above, the declarations show that KB had coverage for business income and extra expense, applicable to cover the amount of actual loss of business income, and extra expense, incurred by KB as a result of regulations relating to the period of repair/replacement of KB's water filtration system, and the enforcement by the FDA of the applicable validation requirements. The exceptions set forth in part 3 of the endorsement do not apply, as none of the "pollutants" identified in SB 146832-B, part 3.b, are applicable, *i.e.*, "pollutants", as defined at SB 146801-I, part 21, do not include any of the substances related to this matter.

57. KB was, and is, therefore entitled to this additional coverage to the maximum of $25,000 per location. Again, Mr. Watkins/CNA simply ignored this coverage.

58. The August 2018 discovery of the mud invasion of KB's water filtration system resulting from the water line rupture, required the shutdown of KB's production for an initial period of 12 months, through August 2019, in order to complete the initial FDA required year-long validation of KB's water system.

13

59.     Following FDA's initial validation of the water system, KB was then further required by the FDA to perform 3 years of stability testing for all products before it would be permitted to produce, and market, its customary, and needed, three-year shelf-life on its products, which was essential for KB to have the commercial ability to market to distributors and retailers.   It was therefore not until December 2021, that all the repair, expert diagnosis, compliance, guidance, FDA required revalidations, and required stability testing, had been completed.

60.     Pursuant to the express definition of "period of restoration" established above, KB's period of restoration began on February 17, 2017, and continued until the FDA certified the premises to resume "operations" at the same level of certification that existed before the suspension of KB's "operations", in December 2021.   The maximum coverage provided for pursuant to this is limited to $25,000 "per location".

61.     Mr. Watkins/CNA once again failed to reference, address, or provide the coverage required by the express terms of its own policy with KB.

62.     Contrary to the express language of the policy, and to the reasonable understandings and expectations of KB, unilateral, arbitrary and oppressive determinations were initially made by CNA in May 2021 to pay only $6,652.90 to KB for the cleaning of KB equipment, and $30,645.75 for "filters used prior to determining the cause of loss".   A net payment was then made of $32,298.65 after application of the $5,000 deductible.   This payment totally ignored the actual cost of repair, replacement, and rebuild of the equipment in the amount of $179,820.22 *for only the equipment at 3 Westside*.   After that**,** on April 8, 2022, CNA provided a payment of only $62,082 for business income losses to KB, limited to an arbitrary 39-day period between February 20, 2017, and March 31, 2017, 5 years before, wholly ignoring the express terms of the CNA/KB policy with regard to lost business income, as well as "extra income".

14

63. CNA again has therefore repeatedly failed to provide the coverages required by the express terms of its own policy, comprising bad faith settlement practices based upon CNA's: attempt to settle the claim for less than the amount to which a reasonable man would have believed he was entitled; failing to promptly provide a reasonable explanation of the basis in the policy in question for the denial of BK's claims; CNA's failure to offer in good faith a compromise settlement; CNA's misrepresentation of pertinent facts, or insurance policy provisions, relating to coverages at issue; refusal of CNA to pay the claims of KB without conducting a reasonable investigation based upon all of the available information; the failure of CNA to attempt in good faith to effectuate a prompt, fair and equitable settlement of claims in which liability had become reasonably clear; compelling KB to institute litigation in order to recover amounts due under an insurance policy by offering substantially less than the amounts that KB would ultimately recover in actions brought by KB.

**SUMMARY OF ESTIMATED POLICY COVERAGES WRONGFULY WITHELD BY CNA:**

64. CNA has wrongfully withheld from KB policy coverage for property damage: $179,820.22 actual replacement costs incurred by KB for 3 Westside Dr., Asheville; payment to KB in the amount of $1.15 million for replacement of the equipment/facilities at 150 Westside. Total: $1,329,820.22

65. CNA has wrongfully withheld from KB policy coverage for business income loss pursuant to policy declarations, and endorsement SB 146802E: $5,297,000, representing the business income loss over the 12-month period of calendar year 2018, as substantiated by KB's 2018 tax return.

15

66.     CNA has wrongfully withheld from KB extended business income loss pursuant to endorsement SB 146802E: $2,207,000, representing lost income incurred during the period beginning on the date of completion of the replacement of KB's water filtration equipment and for 150 consecutive days after that, computed as follows: lost business income figure for 2018 of $5,297,000; 2018 monthly amount = $441,416; x 150 days/5 mos.; + $2,207,000.

67.     CNA has wrongfully withheld from KB policy coverage for extra expenses pursuant to policy declarations, and endorsement SB 146802E: $4,642,651.24 [subject to final calculation], representing those reasonable and necessary extra expenses exceeding normal operating expenses incurred by the operations of KB. Pursuant to the CNA policy regarding this category of coverage, 12 months over which such costs were incurred by KB would be identified. It is not necessary under the CNA policy that such 12 months be a continuous period, nor that they comprise the same period as lost business income damages.

68.     CNA has wrongfully withheld from KB policy coverage for restoration expenses pursuant to endorsement SB 146832-B: $25,000 per each of the 2 locations. Total: $50,000.

**FURTHER DAMAGES INCURRED BY KB, and BY DR. FRANK KING, AND HIS WIFE MS. SUZIE KING, PROXIMATELY RESULTING FROM THE DESTRUCTION OF THE KB BUSINESS**

69.     As a further foreseeable and proximately caused result of the multiple and ongoing failures of CNA to provide the coverages that CNA was obligated to provide, and that KB was entitled to receive:

      **a.**     the business operations, and the business value, of KB have been destroyed. Subject to final determination of that value by expert analysis, KB estimates that the business value of KB was between $20-30 million;

16

**b.** the business operations, and the business value, of the individual plaintiffs, Dr. Frank King, and his wife, Ms. Suzie King, in and to King Bison, LLC, have been destroyed. The assets and going concern value of those interests were applied in an effort to preserve the business and the value of KB when CNA failed to provide the coverages that KB was entitled to receive. Subject to a final determination of that value by expert analysis, KB estimates that the business value of King Bison was between $5-15 million;

**c.** the interests and the value of Dr. and Mrs. King in their family farm, and in multiple real properties owned by them, or owned by and through limited liability entities wholly owned by them, have been destroyed as a proximate result of CNA failing to provide the coverages that KB was entitled to receive, which failure required Dr. and Ms. King to apply their personal assets to the preservation of KB. Subject to final determination of that value by expert analysis, Dr. and Mrs. King estimate that the value of their personal assets that have been so destroyed exceeds $15 million;

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract

70. KB incorporates herein by reference all preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

71. The Insurance Contract(s) in dispute are valid contract(s), through which CNA agreed to provide to KB one or more policies of insurance.

17

72. KB relied, in good faith, upon CNA providing the insurance coverages CNA was obligated to pay to KB comprising those "business insurance solutions that allow [KB] to better manage [KB's] risks and grow profitably."

73. As alleged herein, CNA has failed to perform its obligations under the terms of the Insurance Contract(s), and has materially breached its obligations to KB.

74. Because the obligations of CNA have been breached, CNA may not seek to enforce any claimed coverage limitation provisions of any such Insurance Contracts.

75. KB demands that judgment be entered against CNA for compensatory, actual, and special damages, reasonable attorneys' fees, pre-judgment interest, post-judgment interest, costs, and an award that this Court deems just and proper.

76. As a result of CNA's violations and breach of its obligations under the Insurance Contract(s), and agreements related thereto, KB has suffered damages in an amount in excess of $75,000.

### SECOND CAUSE OF ACTION:

**CNA's Bad Faith Settlement Practices Pursuant to North Carolina Law, Including but Not Limited to N.C.G.S. 58-63-15, including subpart (11), and Resulting Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S 75-1.1 *et seq.* ("DTPA")**

77. KB incorporates herein by reference all preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

78. The acts, omission's, representations, misrepresentations, and non-disclosures of CNA comprise bad faith settlement practices including, but not limited to:

a. CNA's: attempt to settle the claims of KB for less than the amount to which a reasonable person would have believed he was entitled;

b. refusing to pay a valid claim;

18

c. failing to promptly provide a reasonable explanation of the basis in the policy in question for the denial of BK's claims;

d. CNA's failure to offer in good faith a compromise settlement;

e. CNA's misrepresentation of pertinent facts, including but not limited to relevant insurance policy provisions relating to coverages at issue;

f. misrepresenting the law, and policy language;

g. failing to conduct a prompt and complete investigation;

h. the refusal of CNA to pay the claims of KB without conducting a reasonable investigation based upon all of the available information;

i. the failure of CNA to attempt in good faith to effectuate a prompt, fair and equitable settlement of claims in which liability had become reasonably clear;

j. putting the profits of CNA over the KB/policyholder's valid claims;

k. compelling KB to institute litigation in order to recover amounts due under an insurance policy by offering substantially less than the amounts that KB would ultimately recover in actions brought by KB.

79. The actions of the CNA comprise a violation of N.C.G.S. 58-63-15, including but not limited to, subpart (11).

80. The actions of the CNA as alleged herein also comprise *per se* unfair and deceptive acts and practices in violation of Chapter 75 of the North Carolina General Statutes, including the violation of N.C. General Statutes sections 75-1.1 *et seq.*

81. CNA's actions were unfair or deceptive acts and practices in or affecting commerce, in a continuous effort and attempt to injure and damage KB.

19

82. These violations of the North Carolina DTPA have substantially injured, and continue to substantially injure, KB.

83. As a direct and proximate result of the CNA's wrongful conduct, KB has and will suffer pecuniary loss in an amount expected to exceed $25 million.

84. As a result of such wrongful acts by the CNA, KB is entitled to actual, compensatory, and special damages. KB is also entitled to punitive/treble damages, and court costs, including attorneys' fees and reasonable expert witness fees, pursuant to the DTPA, including but not limited to N.C. General Statute § 75.16.1.

### THIRD CAUSE OF ACTION:
### Fraud and Misrepresentation

85. KB incorporates herein by reference all preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

86. By its actions and omissions, CNA negligently and falsely represented and/or concealed, CNA's actions for the purpose of depriving the KB of its assets, resources and property.

87. The actions and omissions of CNA, including the intentional, and/or negligent misrepresentations, omissions, and concealments of CNA, were reasonably calculated and intended to deceive KB.

88. The actions and omissions of KB did in fact deceive the KB.

89. As a direct and proximate result of CNA's actions, misrepresentations, concealments and omissions, KB is entitled to actual, compensatory, and special damages suffered by KB, in an amount expected to exceed  $25 million.

90. KB is also entitled to punitive/exemplary damages as a result of the alleged wrongful actions, misrepresentations, concealments and omissions of KB.

20

## FIFTH CAUSE OF ACTION:
## Breach of the Duty of Good Faith and Fair Dealing

91.    KB incorporates by reference all preceding and subsequent paragraphs of this Complaint, as though fully set forth herein.

92.    The misrepresentations, actions, and omissions, of CNA violated its obligations to deal fairly and in good faith with KB.

93.    The misrepresentations, actions, and omissions, of the CNA also violated CNA's fiduciary duties to KB.

94.    As a direct and proximate result of the actions, misrepresentations concealments and omissions of CNA, KB has suffered damages in an amount expected to exceed $25 million.

**WHEREFORE**, KB, Dr. Frank King, and his wife, Suzie King, also request the following relief:

1.    Compensatory, actual, and special damages in an amount in excess of $75,000, plus interest; and

2.    Punitive and/or exemplary damages in accordance with applicable North Carolina and Federal law, if so warranted, in an amount in excess of $75,000, plus interest; and

3.    For the damage award to be trebled pursuant to applicable North Carolina law; and

4.    For the costs of this action to be taxed to CNA in accordance with  applicable North Carolina law, if so warranted; and

5.    For an award of attorney's fees, costs, and expert witness fees, in accordance with applicable North Carolina law if so warranted; and

21

6.     For a trial by jury on all issues so triable; and

7.     For such other and further relief as the Court may deem just and proper.


This the 15th day of March, 2023

<div style="margin-left:40%">

**THE FARRELL LAW GROUP, P.C.**

 */s/ Richard W. Farrell, Esq.*
Richard W. Farrell, Esquire
N.C. Bar No.:  16518
*Counsel for Plaintiff*
5000 Falls of Neuse Rd, Suite 410
Raleigh, NC 27609
Telephone: 919-872-0300
Facsimile: 919-872-0303
Email: rfarrell@farrell-lawgroup.com

</div>